**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 24-cr-237 (**RBW**) |
| v. : | |
| : | |
| MATTHEW KOHLER, : | |
| : | |
| **Defendant** : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Matthew Kohler has pleaded guilty to two Class B misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government requests that this Court sentence Kohler to 30 days of incarceration on Count Three and 36 months of probation on Count Four. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

**I.   Introduction**

Defendant Matthew Kohler participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential

1

election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Kohler pleaded guilty to violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G). The government's recommendation is supported by (1) the defendant's advance knowledge of the potential for violence on January 6, (2) his choice to join the frontline wave of rioters laying siege to the Capitol, and (3) his private comments after January 6 demonstrating his support of further disruption and violence.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Kohler's crime support a sentence of 30 days of incarceration on Count Three and 36 months of probation on Count Four.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol provided in the parties' stipulated Statement of Offense. *See* ECF No. 22 at 1–3.

*Defendant Kohler's Role in the January 6, 2021 Attack on the Capitol*

On December 20, 2020, Kohler texted a friend, "Lets do [sic] to DC for the protests on the 6th." After planning their travel from San Jose, California, that same friend encouraged Kohler to expect violence in Washington, D.C, telling Kohler that "those antifa faggots need to be killed lol." Kohler endorsed his friend's violent rhetoric, replying "I agree what r you doing this weekend." Kohler's grandfather cautioned him and explained over text message that "[e]ven if the states in question were found to have problems with the election . . . results it would not be enough to change the outcome for the next president." Even after Kohler traveled across the country and reached Washington, D.C., he continued to receive warnings about the violence that was anticipated. On January 5, for example, Kohler's then-girlfriend texted him a warning: "Heard you landed. Pretty uneasy they are anticipating a lot of violence and covid spread on the 6th." She continued, "I love you and just remember me and baby really need you."

Despite these warnings, Kohler attended the "Stop the Steal" rally at the Ellipse on January 6 and later joined a large crowd in marching toward the U.S. Capitol. ECF No. 22 at ¶ 8. News of the events at the Capitol had spread back to California, prompting Kohler's then-girlfriend to once again text him, asking him if he was okay and imploring, "Please don't rush any barricades." Kohler replied, "I won't I love you."

Kohler eventually reached the Capitol's West Plaza, where officers from the U.S. Capitol Police ("USCP") and MPD had formed a police line to attempt to prevent rioters from advancing further toward the Capitol. By 2:19 p.m., however, Kohler had joined the crowd in advancing up a recently breached exterior stairway on the Capitol's northwest side, leading toward the Capitol's Upper West Terrace. *Id.* From the Upper West Terrace, Kohler entered the Capitol building through the Senate Wing Door at 2:23 p.m.—approximately ten minutes after the first breach of the Capitol building, which took place at this entrance. At the time of Kohler's entry, glass in the door was visibly cracked, nearby windows were shattered, and a loud alarm siren was blaring. *Id.* at ¶ 9.



*Image 1: Still of CCTV Footage with Kohler Circled in Red*

Once inside, Kohler walked in the direction of the area of the Capitol known as "the Crypt," where a group of USCP officers had formed a police line blocking rioters from moving deeper into the building. Kohler reached the Crypt at approximately 2:25 p.m., just as a crowd of rioters who had already gathered there began to violently push past the line of USCP officers. *Id.* at ¶ 10. CCTV and open-source footage show Kohler entering the Crypt as the crowd shouts and surges

4

forward. Moments later, Kohler can be seen joining the mob in chanting "OUR HOUSE" and "STOP THE STEAL." Gov. Sent. Ex. 1 at 00:05–00:10; 00:33–00:42.



*Image 2: Still of Open-Source Video Footage, with Kohler Circled in Red*

Kohler remained in the Crypt until approximately 2:32 p.m., when he walked upstairs to the Capitol building's second floor and entered the Rotunda at 2:33 p.m. He stayed in the Rotunda for approximately eight minutes, during which he posed for photographs, joined other rioters in chanting, and filmed his surroundings on his phone. ECF No. 22 at ¶ 11.



*Image 3: Still of CCTV Footage with Kohler Circled in Red*

5

From the Rotunda, Kohler walked south in the direction of the House of Representatives and entered Statuary Hall at approximately 2:41 p.m. There, Kohler saw other rioters waving the crowd forward, and he responded by running towards the House of Representatives. *Id.* at ¶ 12; *see* Gov. Sent. Ex. 2. Within a few seconds, Kohler joined a large crowd that had formed just outside the main entrance to the House Chamber. Kohler moved forward with the crowd and, within two minutes, he stood just yards from the House Chamber entrance. ECF No. 22 at ¶ 12, *see* Gov. Sent. Ex. 3 at 00:10–02:05.



*Image 4*: *Still of CCTV Footage, with Kohler Circled in Red*

At approximately 2:45 p.m., shortly after a group of police officers reached the House Chamber entrance, Kohler turned around and walked back through Statuary Hall and to the Rotunda. ECF No. 22 at ¶ 13. He re-entered the Rotunda at 2:47 p.m. and remained there for approximately three minutes. *Id.* Kohler then left the Rotunda and exited the Capitol building through the East Rotunda Doors at 2:51 p.m. *Id.*

6



*Image 5: Still of CCTV Footage, with Kohler Circled in Red*

Later that day, a friend texted Kohler asking, "did u storm the capitol." Kohler unequivocally replied, "Yes." Kohler's brazen attitude was even more evident when he responded to another text message boasting that "Those politicians are shiting [sic] their pants in there it's on the news they are scared to death." Kohler's response was simple: "Great fuck them."

Three days later, on January 9, 2021, Kohler still remained defiant. In a text message, he asserted "the civle [sic] war has started." And later that day, Kohler texted a contact "it's not over yet and I know the bad guys want us to think we are losing." Kohler assured this contact, however, that "we haven't even begun to fight yet."

*Kohler's Post-Plea Interview with the FBI*

On September 9, 2024, Kohler participated in an interview with law enforcement, pursuant to the terms of his plea agreement. Kohler claimed that, after seeing a Facebook or Instagram ad about stopping the certification of the 2020 Presidential election results, he developed an interest in traveling from California to be in Washington, D.C., on January 6. Once in D.C., he described attending the "Stop the Steal" rally, where he stood towards the front of the stage. Kohler stayed

7

at the rally for the entirety of then-President Trump's speech before walking to the Capitol because, he claimed, everyone else was going there.

Kohler claimed that he did not see any signs or fences—either intact or torn down—on his walk to the Capitol. Likewise, he claimed to have never seen any tear gas, let alone experience the effects of tear gas or OC spray—despite CCTV footage from the Capitol's West Plaza showing multiple plumes of tear gas rising above the northwest stairs around the time Kohler was present at that location. *See* Gov. Sent. Ex. 4.

Kohler did admit, however, that he heard a siren blaring as he entered the Capitol building via the Senate Wing Door. At the time of his entry into the building, he recalled thinking "this is nuts." When asked about his time in the Crypt, Kohler explained that he thought it was a "cool" area and mentioned that he and the rest of the crowd were excited. Recounting his path through the Capitol, Kohler once again deflected responsibility by insisting that he just followed the crowd to reach the hallway outside the House Chamber. Kohler conceded that he knew that the crowd had gathered outside one of the chambers of Congress, although he mistakenly referred to it as the Senate Chamber.

Kohler explained that, once he heard that a woman had been shot, he realized he needed to "get the hell out of there," which prompted him to exit the building and return to his hotel.

During this interview, law enforcement confronted Kohler with his text messages, in which he responded "Great fuck them" in response to a message stating that "politicians are shiting their pants in there" and were "scared to death." Kohler's response was simple, saying that the statement was "pretty self-explanatory," and that "the mood was 'fuck them.'"

*The Charges and Plea Agreement*

On May 15, 2024, the United States charged Kohler by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1), (2) and 40 U.S.C. §§ 5104(e)(2)(D), (G). On August 5, 2024, pursuant to a plea agreement, Kohler pleaded guilty to Counts Three and Four of the Information, charging him with violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G). By plea, Kohler agreed to pay $500 in restitution to the Architect of the Capitol.

### III.  Statutory Penalties

Kohler now faces a sentencing for violating 40 U.S.C. §§ 5104(e)(2)(D) and (G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000 for each of these offenses. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As these offenses are Class B misdemeanors, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 30 days of incarceration on Count Three and 36 months of probation on Count Four.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States*

9

*v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Kohler's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Kohler, the absence of violent or destructive acts is not a mitigating factor. Had Kohler engaged in such conduct, he would have faced additional criminal charges.

Text messages between Kohler and a friend reveal that Kohler had contemplated the possibility of political violence before January 6. On December 20, 2020, Kohler texted a friend, "Lets do [sic] to DC for the protests on the 6th." After planning travel from San Jose, California to Washington, D.C., a friend texted Kohler, "those antifa faggots need to be killed lol." Kohler replied, "I agree what r you doing this weekend." This text message exchange demonstrates Kohler's agreement with the idea of violence against those with whom he had political differences. His then-girlfriend tried to talk Kohler down from attending the "Stop the Steal" rally by noting the possibility for violence, texting him on January 5th: "Heard you landed. Pretty uneasy they are anticipating a lot of violence and covid spread on the 6th." Unlike some rioters, Kohler was warned of the prospect of political violence well in advance of January 6. Rather than being deterred, however, Kohler expressly condoned that violence, in text messages to his friend, and proceeded to the Capitol on January 6.

During the riot, Kohler was in the frontline wave of rioters laying siege to the Capitol. Kohler breached the Capitol building at 2:23 p.m, "minutes after other members of the mob first breached the building at 2:13 p.m." *United States v. Robertson*, 103 F.4th 1, 6 (D.C. Cir. 2023). Kohler "was part of the mob that forced members of Congress to flee from the Senate chamber at 2:12 p.m. and from the House chamber at 2:30 p.m." *Id*.

10

Kohler reached the Crypt at approximately 2:25 p.m., just as the crowd of rioters who had already gathered there began to push past a line of police officers in the middle of the room. Kohler—who later described his time in the Crypt as "cool" and exciting—joined the mob in chanting "OUR HOUSE" and "STOP THE STEAL" as the mob surged forward. All the while, lawmakers cowered, gripped by terror and disbelief. The country watched live coverage of the siege wondering if lawmakers would survive and democracy would prevail.

Kohler eventually made his way to Statuary Hall at approximately 2:41 p.m. and joined a crowd that had formed outside the entrance to the House Chamber. According to Kohler, he only retreated and exited the Capitol after finding out that a fellow rioter had been shot.

Kohler remained defiant in the immediate aftermath of the riot. He admitted to storming the Capitol, said "Great fuck them" in response to a text message about how fearful lawmakers were. He texted a contact, "the civle [sic] war has started," later adding, "I think we haven't even begun to fight yet." Kohler's comfort with violence and his defiance before, during, and after January 6 frame the nature and circumstances of his crimes that day. Accordingly, a sentence of 30 days of incarceration on Count Three and 36 months of probation on Count Four are warranted in this case.

### B. Kohler's History and Characteristics

As set forth in the PSR, Kohler has a minimal criminal history, which consists of one "Drunk in Public" conviction from approximately ten years ago. He has been compliant with the terms of his release. Kohler reports coming from a close and loving family that has supported him before and after his crimes on January 6. As was evident in Kohler's text message conversations leading up to January 6, he had family members who tried to be the voice of reason in his life. While some of Kohler's family members have acute health issues, it appears that Kohler has his

own health issues under control and only requires a doctor's visit approximately once each year. He is a journeyman iron worker and holds a forklift and rigger operating certifications. Neither his family's medical issues nor his own medical issues should serve as an obstacle to a relatively short custodial sentence.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. Notably, unlike some other misdemeanor defendants, Kohler remained defiant before, during, and after the January 6 attack on the Capitol. Moreover, close family members had texted Kohler in advance of his participation in the riot, warning him that there was a high likelihood of violence. Kohler was therefore on notice of this risk of violence before ever entering Capitol grounds. For his crimes on January 6, Kohler showed himself to be immune to pleas of reason, even from those closest to him. Such stubborn commitment to his own desires—regardless of the law or the guidance of those closest to him—raise concerns of recidivism.

Before Kohler's travel to Washington, D.C., his grandfather explained to him over a text message that any suspected vote tabulation issues were not outcome-determinative. His then-girlfriend specifically warned him about the possibility of violence on January 6. Nonetheless, those unambiguous warnings from people he loved and respected were insufficient to deter him; rather he disregarded both of them and joined the angry mob that invaded the Capitol. Instead of showing remorse in the aftermath, Kohler said "Great fuck them" in response to a text message about lawmakers being "scared to death." Three days later, he texted, "the civle [sic] war has started" and "I think we haven't even begun to fight yet." The Court should impose a sentence that specifically deters Kohler from future crimes motivated by political violence.

13

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence Kohler based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Kohler has pleaded guilty to two Class B misdemeanors—specifically, Counts Three and Four of the Information. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Kevin Cronin II*, 22-CR-233-2 (ABJ), Judge Jackson sentenced the defendant to 30 days of incarceration for a violation of 40 U.S.C. § 5104(e)(2)(G), despite many potentially mitigating circumstances (including the recent death of the defendant's mother,

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

absence of prior criminal history, and service in the Army and National Guard). Kohler lacks the mitigating circumstances that Cronin had. And, while Cronin entered the Capitol three times on January 6 whereas Kohler entered only once, significant aggravating factors exist here that were absent in *Cronin*. In that case, there was no evidence that Cronin actively contemplated violence prior to January 6 or that he continued to condone political violence subsequently. In contrast, Kohler's previously discussed text messages before, during, and after January 6 are concerning and should be considered an aggravating factor in this case.

In *United States v. Raul Jarrin*, 22-CR-153 (RCL), Judge Lamberth sentenced the defendant to 30 days of incarceration and 36 months of supervised release for violations of 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). In *Jarrin*, the defendant remained inside the Capitol building for only 15 seconds, entering at 2:45 p.m. Later, however, Jarrin lied to the FBI about being inside the Capitol building and also deleted photos and videos from January 6 from his phone. While taking into account Jarrin's absence of criminal history, age (63 years-old), employment, and status as a caretaker, Judge Lamberth imposed a sentence of 30 days of incarceration and 36 months of supervised release. Admittedly, Jarrin's lies to the FBI and deletion of evidence were significant aggravators. However, Kohler's violent rhetoric before and after January 6 is likewise an aggravator. And, compared to Jarrin, Kohler's offense conduct is much more substantial: Kohler entered the Capitol building just ten minutes after its initial breach and remained inside for nearly half an hour.

Finally, in *United States v. Mariposa Castro*, 21-CR-299 (RBW), this Court sentenced the defendant to 45 days of incarceration for a violation of 40 U.S.C. § 5104(e)(2)(G). In *Castro*, the defendant went into the Capitol through a window that had been broken out, walked to a conference room of the Senate, and was ultimately driven out by tear gas. Similar to Kohler's

language over text messages, the defendant in *Castro* stated, "This is war" in advance of going to the Capitol and later blamed the violence on supporters of Antifa and Black Lives Matter. Kohler's conduct appears similar in gravity to that of the defendant in *Castro*, except that he did not blame others like Antifa or Black Lives Matter for causing the violence on January 6.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

V.      **Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense

16

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Kohler must pay $500 in restitution, which reflects in part the role Kohler played in the riot on January 6.[4] ECF No. 21 at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Kohler's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 89.

## VI. Fine

The defendant's convictions for violations of Counts 3 and 4 subject him to a statutory maximum fine of $5,000 on each count. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1). The burden is on the defendant to show present

---

against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). Here, the defendant has not shown an inability to pay, thus the Court has authority to impose a fine.

## VII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence the defendant, Matthew Kohler to 30 days of incarceration on Count Three and 36 months of probation on Count Four. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Kohler's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By: */s/ Naveed Amalfard*
NAVEED AMALFARD
Special Assistant United States Attorney
NY Bar No. 6039234
601 D Street NW
Washington, DC 20530
naveed.amalfard@usdoj.gov
(202) 834-4516

/s/ *Sean J. Brennan*
SEAN J. BRENNAN
Assistant United States Attorney
NY Bar No. 5954128
601 D Street NW
Washington, DC 20530
sean.brennan@usdoj.gov
(202) 252-7125